**Pharmacists Mutual Insurance Company v. Glenn A. Myer, Reggie Cooper and MMG Insurance Company**

[993 A.2d 413]

No. 08-405

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed February 4, 2010

*Paul J. Perkins* of *Plante & Hanley, P.C.*, White River Junction, for Plaintff-Appellee.

*Joshua L. Simonds* of *Mertz, Talbott & Simonds, PLC,* Burlington for Defendant-Appellant Myer.

¶ 1. **Reiber, C.J.** Glenn A. Myer appeals from a summary judgment declaring that his insurer, Pharmacists Mutual Insurance Company, owed him no duty to indemnify or pay defense costs on appeal from a third-party claim, and dismissing Myer's counterclaims for bad faith and consumer fraud. We affirm the court's dismissal of the counterclaims, but reverse its decision on the duty to defend and indemnify, and remand for further proceedings.

¶ 2. The material facts are largely undisputed. In 2002, Myer owned a condominium at the Topnotch Resort and Spa in Stowe, Vermont, and hoped to purchase another as an investment property. Myer and two friends agreed to share the purchase, and the

friends placed a deposit of $46,900 on a unit and entered into a purchase-and-sale agreement with Topnotch, contingent upon their obtaining financing. Myer allegedly paid half of the deposit. The friends failed to obtain financing, and Topnotch declared the buyers to be in default. Topnotch retained the deposit pursuant to the terms of the agreement. Myer and his friends sued Topnotch, alleging conversion and fraud. The trial court entered summary judgment in favor of Topnotch, and this Court affirmed. See *Coughlin v. T.N. Assocs.*, No. 2005-195, 2006 WL 5866290 (Vt. May 25, 2006) (unpub. mem.), available at http://www.vermontjudiciary. org/d-upeo/eo05-195.aspx.

¶ 3. While the fraud action was pending, Reggie Cooper, then the president and general manager of Topnotch, filed a complaint against Myer for defamation. Cooper alleged that Myer had made a number of statements to various third parties falsely accusing Cooper of stealing $47,000 in connection with the condominium transaction, of embezzling $100,000 from Topnotch, and of being under a criminal investigation and about to be fired. Cooper later amended the complaint to add a claim of intentional infliction of emotional distress (IIED) stemming from an incident in which Myer allegedly called the Stowe Police Department threatening to kill Cooper.

¶ 4. The case was tried before a jury, which returned a special verdict form and interrogatories in which it responded "Yes" to the following two questions:

> 6(A). Were any such [false and defamatory] statement(s) made by Mr. Myer accusing Reggie Cooper of stealing or embezzling from Topnotch itself, other owners, or the condo Association; and if so, were such statements made negligently?

> 6(B). Were any such [false and defamatory] statement(s) actually made by Mr. Myer arising out of, or concerning his various disputes with Topnotch and/or the condo Association; and if so, is it clear and convincing that such statements were made with actual knowledge of falsity [or] reckless disregard of their probable falsity, to any person outside the scope of any privilege, or maliciously and with ill will?

The jury further found that Myer's statements had maligned Cooper's character and reputation, and awarded damages of

$150,000 on the defamation claim ($75,000 for injury to reputation and $75,000 for actual harm) as well as $200,000 for IIED. This Court again affirmed the judgment. *Cooper v. Myer*, 2007 VT 131, 183 Vt. 561, 944 A.2d 915 (mem.).

¶ 5. Nearly two years after Cooper's defamation suit was filed, Myer tendered the complaint to Pharmacists, which had issued him a homeowner's policy that included an endorsement providing liability coverage for "personal injury." The policy defined the latter to include "misrepresentation, libel, slander [and] defamation of character," but specifically excluded coverage for personal injury "caused by a publication or statement made by . . . an insured, if the insured knew or had reason to believe that the publication or statement was false." Pharmacists responded with a reservation-of-rights letter to Myer stating that it had identified "several issues that may defeat all insurance coverage for this claim" while acknowledging that "[p]ortions of Cooper's defamation claim *may* come within the scope of coverage for personal injury provided by the policies." Pharmacists thus concluded that "insurance-coverage issues . . . exist in this case [that] create a conflict of interest between your interests and ours," urged Myer to retain his own attorney, and agreed to pay "reasonable attorney's fees and costs only until a court determines that we have no duty to defend and indemnify you in the *Cooper* litigation." Myer had already retained independent counsel, who continued to represent him throughout the trial. Pharmacists continued to monitor the trial through the self-styled "litigation specialist" who had authored the reservation-of-rights letter. Pharmacists further agreed to pay attorney's fees and costs until the end of trial, but refused to pay for fees and costs incurred in the appeal.

¶ 6. Shortly after judgment was entered in the defamation suit, Pharmacists filed this declaratory judgment action in the superior court, asserting that it had no duty to defend or indemnify Myer because coverage was precluded under the terms of the homeowner's policy. Myer counterclaimed, alleging that Pharmacists had breached the covenant of good faith and fair dealing and violated the Consumer Fraud Act by failing to pay for all of his attorney's fees and providing "illusory coverage."[1] Pharmacists

---

[1] Myer also filed a third-party complaint against MMG Insurance Company under a separate policy issued to Myer, but the court granted MMG's motion to dismiss

moved for summary judgment and subsequently also moved to dismiss the counterclaims, asserting that Myer had failed to provide prompt notice of the claim as required by the policy, that it had acted in good faith, and that the Consumer Fraud Act was inapplicable.

¶ 7. The superior court issued a written decision in November 2007. The court noted preliminarily that the sole coverage issue concerned defamation, Myer having conceded that the IIED claim was not covered by the policy. Based on the jury's special verdict, the court concluded that Myer's defamatory statements were not covered by the policy under a provision excluding coverage for defamatory statements which the insured "knew or had reason to believe . . . [were] false," and that Pharmacists was therefore not obligated to indemnify Myer for the $150,000 defamation award. The court further concluded, however, that because the defamation suit was *potentially* covered by the policy, Pharmacists owed a duty to defend and was liable for defense costs from the date that Pharmacists received notice of the claim through the date of the jury verdict, but not through appeal. The court dismissed the counterclaim under the Consumer Fraud Act, concluding that the Act did not apply to insurance claims, and dismissed the bad faith claim conditioned on Pharmacists payment of attorney's fees and costs in the underlying defamation action. This appeal followed.

¶ 8. Myer contends the court erred in concluding as a matter of law, based on the special verdict, that the statements which the jury found to have been made negligently were not covered.[2] We agree. The special verdict form reflected the court's instructions, which had specifically informed the jury that it must "separately" address the "two types of statements" at issue: (1) those related "to the various disputes and claims that [Myer] had with and against Topnotch," including the ill-fated purchase-and-sale agreement and certain complaints that Myer had against Topnotch concerning his own condominium; and (2) "a second category of

the complaint, and that ruling has not been appealed. We note that MMG subsequently filed a separate declaratory judgment action against Myer in federal district court, which ruled that MMG was liable for half of the defense costs incurred by Myer in the *Cooper* litigation, including the costs of appeal. *MMG Ins. Co. v. Myer*, No. 1:07-CV-4, 2008 WL 822082 (D. Vt. Mar. 26, 2008).

[2] Myer does not challenge the conclusion that the statements which the jury found to have been made by Myer with knowledge or reckless disregard of their falsity were excluded from coverage.

statements . . . concern[ing] the allegations that Mr. Cooper had stolen money, or was embezzling from Topnotch itself." As to the former, the court instructed that Myer enjoyed a "qualified privilege" to speak about matters affecting his own interests, and therefore required a showing by clear and convincing evidence that Myer knew or should have known that the statements were false, or made them with reckless disregard concerning their probable falsity, or out of ill will or spite. The second category of statements, in contrast, required a showing that Myer was "simply negligent," which "need only be proven . . . by a preponderance of all the evidence." It is thus abundantly clear that the jury was directed to consider *separately* the two categories of statements, to apply *separate* standards of liability to each, and to return *separate* verdicts on each. We discern no basis to interpret the special verdict, therefore, as finding that all of the defamatory statements were made by Myer with knowledge of their falsity or reckless disregard thereof.

¶ 9. Pharmacists maintains, nevertheless, that the jury necessarily found that all of the statements were made with knowledge or reckless disregard of their falsity because neither party expressly asserted negligence at trial; Cooper had claimed that all of the defamatory statements were made with knowledge of their falsity or reckless disregard thereof, while Myer defended on the grounds that he had not made certain statements and that others were true. However the parties framed the issue, the trial court here explicitly instructed the jury that the defamation claim involved two separate sets of statements — with separate and distinct burdens of proof and liability standards — the one requiring proof by a preponderance of the evidence of negligence, the other by clear and convincing evidence of knowledge or recklessness. The jury's answers to the interrogatories were equally clear, straightforward, and unambiguous and entirely consistent with the court's instructions. See *Watkins v. Fibreboard Corp.*, 994 F.2d 253, 256 (5th Cir. 1993) ("The answers to interrogatories must be considered in the light of the trial judge's instructions."); *Morton v. City of Chicago*, 676 N.E.2d 985, 990 (Ill. App. Ct. 1997) ("We construe a special interrogatory within the context of all of the instructions to determine how it was understood by the jury."). When viewed together, the instructions and special interrogatories leave no doubt that the jury was specifically directed to determine whether certain statements were

made negligently, and it made that express finding. We find no basis to conclude that the jury might have harbored an intent or understanding of the issue markedly different from that plainly expressed in the special verdict. See *P & L Contractors, Inc. v. Am. Norit Co.*, 5 F.3d 133, 138 (5th Cir. 1993) (a court is "bound to enter judgment on the jury's answers [to special interrogatories] if they are clear and consistent").

■ ■ ¶ 10. Despite the special verdict, Pharmacists also appears to renew its claim, raised below, that all of the statements fall within the policy exclusion for defamatory statements which "the 'insured' knew or had reason to believe . . . [were] false." Although the phrase "reason to believe" is not defined under the policy, Pharmacists appears to suggest that it incorporates a negligence standard and thus bars coverage of those statements found by the jury to have been made negligently. The argument is unpersuasive. We traditionally construe uncertain or ambiguous policy language liberally in favor of the insured and full coverage. *Serecky v. Nat'l Grange Mut. Ins.*, 2004 VT 63, ¶ 17, 177 Vt. 58, 857 A.2d 775. As Myer argued below, to construe the exclusionary language in question to bar coverage of *negligently* made defamatory statements would virtually eviscerate the coverage provision for "misrepresentation, libel, slander, defamation of character, or invasion of privacy." It is axiomatic that constructions of exclusionary clauses to nullify coverage provisions are not reasonable. See, e.g., *Safeco Ins. Co. v. Robert S.*, 28 P.3d 889, 894 (Cal. 2001) (rejecting construction of exclusion "so broad as to render the policy's liability coverage practically meaningless"). Thus, in an analogous context, courts have generally construed policy exclusions for "intentional" misconduct to bar coverage of defamatory statements made with malice or an intent to deceive, while leaving intact coverage of defamatory statements made negligently. See, e.g., *Uhrich v. State Farm Fire & Cas. Co.*, 135 Cal. Rptr. 2d 131, 139 (Ct. App. 2003) (rejecting claim that coverage of defamation was precluded under intentional-misconduct exclusion since "an insured could be liable for defamation for negligently publishing a defamatory statement"); *Williamson v. Historic Hurstville Ass'n*, 556 So. 2d 103, 107 (La. Ct. App. 1990) (since "the tort of defamation is not exclusively an intentional tort" and "can occur through negligent acts," intentional tort exclusion did not bar coverage of defamation).

¶ 11. Moreover, although case law construing such exclusions is scarce, at least one court has rejected a claim very similar to Pharmacists'. In *Hingham Mututal Fire Insurance Co. v. Smith*, 865 N.E.2d 1168, 1173 n.8 (Mass. App. Ct. 2007), it was the insured who argued that an identical exclusion for publications which the insured "knew or had reason to believe . . . [were] false" applied to negligence claims, thus rending illusory the policy's personal-injury coverage of defamation. The court concluded otherwise, however, explaining that the exclusion "in its usual and ordinary sense" applied only where there was a willful "intent to deceive." *Id.*

¶ 12. Indeed, a review of modern defamation law reveals that courts and commentators routinely employ the phrase "knew or had reason to believe" as a shorthand for a state of mind equivalent to gross or willful misconduct or even actual malice, the higher standard constitutionally required in certain defamation cases. See, e.g., *O'Hara v. Bd. of Educ.*, Nos. 01-4269, 02-3093, 2003 WL 21774013, at *3 (6th Cir. July 30, 2003) (finding no showing of recklessness in the context of defamation where plaintiff did not contend that defendant "knew or had reason to believe the statements he made were false"); *Canino v. Barclays Bank, PLC*, No. 94 Civ. 6314, 1998 WL 7219, at *2 (S.D.N.Y. Jan. 7, 1998) (noting that defamatory statements "were made neither with common law malice nor with actual malice because none of the speakers had reason to believe that the statements were probably false"); see generally L. Bloom, *Proof of Fault in Media Defamation Litigation*, 38 Vand. L. Rev. 247, 278 (1985) (observing that while fabrication of nondefamatory statements may not "prove directly that the defendant knew or had good reason to believe that the defamatory charges were false" it is probative of actual malice); J. Boasberg, *With Malice Toward None: A New Look at Defamatory Republication and Neutral Reportage*, 13 Hastings Comm. & Ent. L.J. 455, 456 (1991) (arguing that the republication of defamatory statements should be allowed "even when the republisher knows or has reason to believe that the statements are false (*i.e.*, when the republisher does have actual malice"); Note, *Does Ethics Make Good Law? A Case Study*, 19 Cardozo Arts & Ent. L.J. 467, 479 (2001) (observing that generally "it is not dispositive of actual malice that a newspaper or broadcaster has acted carelessly, unfairly or even irresponsibly as long as he had no reason to believe that a news story is false");

see also *State v. Schaefer*, 2003 WI App 164, ¶¶ 32-41, 668 N.W.2d 760 (Ct. App.) (holding that although "knows or reasonably should know" does not require actual knowledge, it is not the equivalent of a civil negligence standard); cf. *State v. Jude*, 554 N.W.2d 750, 753-54 (Minn. Ct. App. 1996) (rejecting claim that statute making it unlawful to publish false campaign materials which the person "knows or has reason to believe is false" creates an ordinary negligence standard, but holding that it was closer to "gross negligence" than "reckless disregard"). We thus conclude that the exclusion does not apply to defamatory statements made negligently.

¶ 13. In sum, therefore, we hold that the trial court erred in entering summary judgment in favor of Pharmacists on the basis of the special verdict. Pharmacists, of course, remains free on remand to seek to prove on the basis of other evidence that *all* of the statements, including those found by the jury to have been made negligently, fall within the exclusion for statements which Myer knew or had reason to believe were false.

■ ¶ 14. For purposes of judicial economy, we also consider the corollary issue, raised and briefed by the parties, as to how — if at all — to allocate the damage award in the event of a finding on remand that some of the defamatory statements were merely negligent and therefore within the policy coverage. As noted, the jury in the *Cooper* litigation rendered an undifferentiated award of $150,000 for defamation; it did not distinguish between covered and uncovered conduct. It is settled law in Vermont, however, that once an insured has demonstrated coverage under a policy, the burden falls "on the insurer to show that a third party's claim against the insured is *entirely excluded* from coverage." *State v. CNA Ins. Cos.*, 172 Vt. 318, 324, 779 A.2d 662, 667 (2001) (emphasis added). Thus, it was, and remains, Pharmacists' burden to demonstrate that the award was based upon conduct entirely excluded from coverage, or to show how the jury allocated damages as between covered and uncovered conduct.

■ ■ ¶ 15. In the absence of special interrogatories it is impossible, of course, to reliably allocate the defamation damages, but the problem could — and should — have been avoided. While Pharmacists did not control the litigation — having perceived a conflict and deferred to independent counsel — it nevertheless continued to monitor the *Cooper* trial through its "litigation

specialist" and remained in regular contact with defense counsel. Indeed, Pharmacists remained the most informed party concerning coverage issues and the potential difficulties of parsing a general verdict as between covered and uncovered claims. Therefore, to protect its interests and meet its burden it was incumbent upon Pharmacists to notify the trial court and the parties of the potential apportionment issue and of the need for special interrogatories allocating damages, to seek permission if necessary to attend the charge conference to propose such interrogatories, or even to intervene in the litigation if all else failed. See e.g., *Duke v. Hoch*, 468 F.2d 973, 979 (5th Cir. 1972) (although insured had retained separate counsel, it was the insurer's obligation to notify the insured of the potential future allocation problem as between covered and uncovered claims and the advisability of a special verdict to segregate the damages); *Thomas v. Henderson*, 297 F. Supp. 2d 1311, 1323-27 (S.D. Ala. 2003) (where insurer was furnishing a defense under a reservation of rights, it would be allowed to intervene for the limited purpose of proposing special jury interrogatories allocating damages between covered and uncovered claims, rejecting claims that intervention would unduly prejudice the parties, confuse the jury, or delay the trial); *Butterfield v. Giuntoli*, 670 A.2d 646, 658 (Pa. Super. Ct. 1995) (holding that insurer had the opportunity and the obligation to request specific interrogatories allocating damages between covered and uncovered claims where insurer's attorney attended the trial, was in contact with defense counsel, and sat in on chambers conferences); see generally 1 A. Windt, Insurance Claims & Disputes § 6:27, at 6-227 to 6-228 (5th ed. 2007) (observing that, although many courts have placed the burden of apportioning an award between covered and uncovered claims on the insured, the burden should fall on the insurer where "the circumstances surrounding the defense of the underlying action were such that the insurer was obligated to seek an allocated verdict or advise the insured of the need for one, but failed to fulfill that obligation").

¶ 16. As the court in *Butterfield* — in similar circumstances — observed, "[w]hile in court, in chambers, or through the defense attorneys handling the case, [the insurer] had the opportunity to request specific instructions on the question, specific interrogatories, or special verdict forms." 670 A.2d at 658. The court also noted that, if necessary, the insurer had the option to

intervene, but "did not pursue any means available to them . . . to definitively determine its duty to indemnify [the insured]." *Id.* Therefore, the court concluded as a matter of law that the insurer could not meet its "burden of proving that the . . . claim was excluded from coverage," and that summary judgment against the insurer was compelled. *Id.* Here, similarly, Pharmacists failed to seek an allocated verdict on the defamation award and thus cannot meet its burden to demonstrate that the award was for statements entirely excluded from coverage under the policy. Pharmacists, therefore, would remain responsible for the defamation award in its entirety in the event that any of the statements are ultimately found to fall within the policy coverage. See *Liquor Liab. Joint Underwriting Ass'n v. Hermitage Ins. Co.*, 644 N.E.2d 964, 969 (Mass. 1995) (where insurer fails to carry its burden of allocating a judgment between covered and uncovered claims, it is liable for the entire judgment).

¶ 17. Myer further claims that the trial court erred in concluding that Pharmacists had no duty to pay attorney's fees and costs incurred in the appeal from the judgment in the *Cooper* litigation.[3] The court's decision appears to have been based upon its conclusion that none of the claims or damages fell within the policy coverage. The ruling was unsound in two respects. First, as discussed above, the judgment awarded damages for both covered and uncovered claims. Second, the general rule is that an insurer under a general duty to defend is required to bring an appeal on its insured's behalf "when there are reasonable grounds to believe that the insured's interests might be served by an appeal." 1 Windt, *supra*, § 4:17, at 4-160; accord *Delmonte v. State Farm Fire & Cas. Co.*, 975 P.2d 1159, 1168 (Haw. 1999) (observing that "the general rule is that the insurer . . . owes a duty to appeal in all instances where it appears the substantial interests of the insured may be served" and "reasonable grounds for an appeal exist" (quotation omitted)); *Truck Ins. Exch. of Farmers Ins. Group v. Century Indem. Co.*, 887 P.2d 455, 459 (Wash. Ct. App. 1995) (noting the general rule that "an insurer owing a duty to defend its insured is liable for the costs of prosecuting an appeal from a

---

[3] Although Myer raised the issue of defense costs in his counterclaim for bad faith, the issue was also integral to Pharmacists' motion for summary judgment seeking a ruling that it had no duty to defend the *Cooper* litigation, and we address it in that context.

judgment against its insured provided there are reasonable grounds for the appeal"); see generally 22 E. Holmes, Holmes' Appleman on Insurance § 136.11, at 86 (2d ed. 2003) (insurer is obligated to bring an appeal "when there appear to be reasonable grounds that a substantial interest of the insured may be served or protected by an appeal"). As discussed, the underlying judgment here exposed Myer to both covered and uncovered damages; a reversal would plainly have served his interests; and the appeal raised at least reasonable — if ultimately unsuccessful — grounds for challenging the judgment. See *Cooper*, 2007 VT 131, ¶ 6 (acknowledging the "impressive list of civic and business organizations" in which Cooper held leadership positions and "his prominent role" in the community while rejecting the claim that he should have been treated as a "public figure" requiring actual malice for defamation damages). Accordingly, we hold that Myer was entitled to recover attorney's fees and costs incurred in prosecuting the appeal in the *Cooper* litigation.[4]

¶ 18. Finally, Myer contends that the court erred in dismissing his counterclaims for bad faith and consumer fraud. Although Myer filed no opposition to the motion to dismiss, the court briefly addressed the claims on the merits, finding no bad faith in the failure to pay appellate costs and no duty under the Consumer Fraud Act. We conclude, however, that Myer's failure to oppose the motion effectively waived the claims, and we therefore decline to address them. See *Progressive Ins. Co. v. Brown ex rel. Brown*, 2008 VT 103, ¶¶ 8-9, 184 Vt. 388, 966 A.2d 666 (holding that insurer which had the opportunity to raise arguments in its opposition to a motion for summary judgment and failed to do so waived the arguments on appeal).

*That portion of the summary judgment declaring that Pharmacists owed no duty to indemnify Myer for the $150,000 defamation award or to pay for attorney's fees and costs incurred in his appeal from the underlying judgment in the Cooper litigation is reversed, and the matter remanded for further proceedings consistentwith the views expressed herein.*

---

[4] Pharmacists also appears to assert that the reservation-of-rights letter represented a separate and superseding agreement in which it undertook to defend Myer "only until a court determines that we have no duty to defend and indemnify you in the *Cooper* litigation." Even if this were the case, the verdict in the *Cooper* litigation did not — as we have explained — demonstrate that Pharmacists owed no duty to defend or indemnify, but precisely the opposite. Accordingly, the reservation-of-rights letter did not represent a basis for refusing to pay Myer's defense costs on appeal.