2013 VT 80

# State Farm Mutual Automobile Insurance Company v. Seth Colby and Joan Lamotte, Administrator of the Estate of Kim Lamotte

[82 A.3d 1174]

No. 12-221

Present: Reiber, C.J., Dooley, Skoglund, Burgess and Robinson, JJ.

Opinion Filed September 13, 2013

*Robin Ober Cooley* of *Pierson Wadhams Quinn Yates & Coffrin*, Burlington, for Plaintiff-Appellee.

*Bruce Palmer* of *Downs Rachlin Martin PLLC*, St. Johnsbury, for Defendant-Appellant Colby.

*Steven A. Adler* and *Daniel D. McCabe* of *Axelrod & Adler, PLLC*, St. Johnsbury, for Defendant-Appellant Lamotte.

¶ 1. **Robinson, J.** This case requires us to determine whether the omnibus clause in a specific automobile insurance policy provides coverage to a permittee to whom the insured owner loans the car when that first permittee is subject to a negligent entrustment claim for loaning the car to a second permittee. A vehicle owner entrusted her car keys to defendant, who in turn passed them along to another driver. The driver was involved in a fatal, single-car accident and the driver's estate sued defendant for negligent entrustment. Defendant sought coverage under the vehicle owner's automobile insurance policy. Defendant appeals from the trial court's order granting summary judgment in favor of the insurer and finding that, as a matter of law, defendant did not qualify for coverage under the policy. We conclude that defendant's entrustment of the vehicle to the driver constitutes

"use" under the omnibus clause of the policy and that the undisputed evidence supports the conclusion that the named insured did not consent to defendant's allowing the driver to drive the car, but that a material issue of fact exists with respect to whether defendant entrusted the car keys to driver reasonably believing that driver would not drive the car. Accordingly, we reverse and remand.

¶ 2. The undisputed facts, considered in the light most favorable to defendant, are as follows. On the day of the accident, defendant, Seth Colby, picked up decedent, Kim Lamotte, who was hitchhiking near Lunenburg. After they traveled to another town where Colby loaded an edger into his truck, Colby took decedent to McDonald's in Lancaster, New Hampshire, where decedent's girlfriend, Kelly Macie, worked. At McDonald's, decedent asked to borrow Macie's car. Macie responded by turning to Colby, whom she did not know, and asking if he had a license and if he had been drinking. Colby said he was licensed and sober. Macie gave Colby the keys without verbal restrictions on his use of the car. Before he took the keys, Colby heard Macie say something to decedent about some boxes that she wanted in the trunk of her car. Colby also heard Macie ask decedent to bring the keys back when she was done working.

¶ 3. Macie testified that she never let decedent drive her car because his driver's license had been suspended for life due to repeated convictions for driving under the influence; she also testified that she could tell within moments of his arrival that he had been drinking. Colby testified that he did not know that decedent did not have a driver's license, and did not know decedent had been drinking. When she gave Colby the keys, Macie did so with the understanding that decedent would not drive the car; Colby understood that Macie did not want decedent to drive her car, and he took the keys with no intention of driving the car himself.

¶ 4. Somewhere between the counter where Macie gave Colby the keys and the car, Colby handed decedent the keys. Colby told decedent not to drive the car, and decedent told Colby that he was not going to drive the car but was going to listen to the car radio. Colby then got in his truck and drove away.

¶ 5. Soon thereafter, Colby saw decedent pass him driving Macie's car. Later in the day, Colby saw decedent again, this time at Colby's brother's home where Colby was unloading his truck.

Colby testified that when they talked at that time he probably told decedent that he should not be driving and should return the car to Macie. Decedent drove away and, later in the afternoon, drove off the road at high speed into a telephone pole, killing himself instantly.

¶ 6. Decedent's estate filed a wrongful death suit against Macie and Colby.[1] Colby seeks coverage under Macie's State Farm insurance policy. With regard to State Farm's duty to defend and indemnify Colby, both State Farm and Colby filed cross-motions for summary judgment. The trial court properly focused its analysis on the omnibus clause of the State Farm policy that provides coverage for someone "while using such a car if its use is within the scope of [policyholder's] consent." The specific question on summary judgment was whether Colby qualifies as an insured under this provision in Macie's policy, and, therefore, qualifies for defense and coverage. This issue raises two separate, but related, inquiries under the policy language: (1) whether Colby's allegedly negligent act of giving the keys to decedent and thereby entrusting him with possession of the car was an act undertaken "while using" the car; and (2) if so, whether that "use" was within the scope of Macie's consent.

¶ 7. The trial court reached only the first question — whether Colby was using the vehicle — and concluded that Colby's conduct in relation to the vehicle could not, as a matter of law, constitute "use" under the insurance policy. The court reaffirmed its conclusion upon motion for reconsideration. The trial court concluded that the term "use" is not ambiguous. Although the trial court acknowledged that "use" means something more than just operation, it concluded that the term does not encompass transferring the right to control the vehicle or giving the keys to an operator. The trial court accordingly denied summary judgment for Colby and granted it for State Farm. Colby appeals.

¶ 8. "We review a motion for summary judgment de novo under the same standard of review as the trial court." *Madowitz v. Woods at Killington Owners' Ass'n*, 2010 VT 37, ¶ 9, 188 Vt. 197, 6 A.3d 1117. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." V.R.C.P. 56(a); *Madowitz*, 2010 VT 37, ¶ 9. A party seeking summary

---

[1] The merits of the wrongful death action are not part of this appeal.

judgment must point to particular parts of the record to support the assertion that a fact can or cannot be genuinely disputed. V.R.C.P. 56(c). "Furthermore, interpretation of an insurance policy, like other contracts, is a question of law. Our review is therefore nondeferential and plenary." *Co-op. Ins. Cos. v. Woodward*, 2012 VT 22, ¶ 8, 191 Vt. 348, 45 A.3d 89 (citation omitted).

¶ 9. ■ ■ Because the cross-motions for summary judgment implicate State Farm's duty to defend, at least with respect to that duty we consider whether "the claim against the insured 'might be of the type covered by the policy.' "[2] *Woodward*, 2012 VT 22, ¶ 10 (quoting *Garneau*, 158 Vt. at 366, 610 A.2d at 134). "The most expansive duty under insurance liability policies is the insurer's duty to defend, but there is no duty to defend when there is no possible factual or legal basis on which the insurer might be required to indemnify." *Id.*

¶ 10. Our legal analysis turns on the same two questions identified by the trial court: Does the wrongful death claim against Colby seek recovery for his conduct "while using" the vehicle? If so, was his use within the scope of Macie's authorization? We conclude that Colby's entrustment of the car keys to decedent amounts to "using" the car for the purposes of the applicable policy language, but we do so with the understanding that in this case the more significant limitation on the policy coverage arises from the requirement that the use be "within the scope of [the named insured's] consent." See *infra*, ¶¶ 24-26.

## I.

¶ 11. ■ We interpret disputed terms in an insurance policy "according to their plain, ordinary and popular meaning" and are guided by a "review [of] the language of an insurance contract from the perspective of what a reasonably prudent person applying for insurance would have understood it to mean." *Woodward*, 2012 VT 22, ¶ 9 (quotations omitted). "If we find ambiguity, we construe the language in favor of coverage . . . ." *Id.*

---

[2] The threshold issue is whether State Farm has a duty to defend, as opposed to a duty to indemnify. We recognize that a conclusion with respect to the duty to indemnify might not be the same, particularly at the end of a trial and after a determination of liability. See *Garneau v. Curtis & Bedell, Inc.*, 158 Vt. 363, 366, 610 A.2d 132, 134 (1992) ("An insurer's duty to defend its insured is broader than its duty to indemnify.").

¶ 12. The State Farm policy does not define "while using." Black's Law Dictionary defines "use" as the "application or employment of something." Black's Law Dictionary 1577 (8th ed. 2004). Whether, or under what circumstances, entrustment of a car is an "application or employment" of the car is not clear on the face of the policy. For that reason, in addition to the reasons described below, we conclude that the term is ambiguous.

¶ 13. This Court has not addressed the specific question of whether entrustment constitutes "use."[3] But see *Coop. Fire Ins. Ass'n of Vt. v. Gray*, 157 Vt. 380, 386, 599 A.2d 360, 363-64 (1991) (Dooley, J., concurring) ("I would hold that basic coverage extends to a negligent entrustment or supervision action were it not excluded by the language of the nonowned auto provision in this instance."). Courts from other jurisdictions that have considered the question have taken a variety of approaches.

¶ 14. Some courts have expressly or implicitly held that entrustment of a vehicle does qualify as "use." For example, the Supreme Judicial Court of Massachusetts addressed whether entrustment constituted "use" for the purpose of a homeowner's-insurance-policy exclusion. *Barnstable Cnty. Mut. Fire Ins. Co. v. Lally*, 373 N.E.2d 966 (Mass. 1978). The court concluded:

> [T]he terms of the policy excluding coverage in the event of "bodily injury . . . arising out of the ownership . . . operation, (or) use . . . of . . . any recreational motor vehicle owned by any Insured" necessarily apply to a situation in which bodily injury is alleged to have been caused by the negligent entrustment of a dangerous instrumentality . . . .

---

[3] We did consider one case very similar to this in which a father loaned a car to his son with express instructions not to allow anyone else to drive it. *Am. Fid. Co. v. Elkins*, 125 Vt. 313, 215 A.2d 516 (1965). The son loaned it to a third person who was in an accident causing injury to another. The applicable policy provided that "insured" included the "named insured and also any person while using the automobile . . . provided the actual use thereof is with the permission of the named insured." *Id.* at 314, 215 A.2d at 517. The injured party sued the driver, but also the father and son, presumably on the ground of negligent entrustment. This Court did not address the question of whether the son's conduct in loaning the car to the driver constituted "using" the vehicle, instead resolving the case on the basis that the father's express instructions to his son not to loan out his car negated the presumption that the son's loaning of the car was within the scope of the father's consent. *Id.* at 316, 215 A.2d at 519.

*Id.* at 968-69. Addressing a divide in the case law, the court wrote, " 'negligent entrustment' as a distinct and specific cause of action is not exclusive of, but, rather, is derived from the more *general* concepts of ownership, operation, and use of a motor vehicle." *Id.* at 969 (emphasis added); see also *Md. Cas. Co. v. Baker*, 196 F. Supp. 234, 239 (E.D. Ky. 1961) (holding that, where insurance policy's omnibus clause provided that any person using insured automobile with permission of named insured was insured, son who had father's permission to use car at time he loaned it to another driver was "an insured person" entitled to defense and indemnity).

¶ 15. On the other hand, some courts have held that entrustment constitutes use only when it benefits the entrustor. For example, in construing an automobile liability policy, the Supreme Court of Alabama addressed whether entrustment by a bailee can be said to be incident of ownership, maintenance, or use of a car. The court held that the bailee's entrustment of the car to a third party in that case was not "use" because "the journey undertaken by [the driver] was at her request, for her own purposes, and was not in any sense beneficial to [the bailee]." *Dutton v. State Farm Mut. Auto. Ins. Co.*, 383 So. 2d 519, 521 (Ala. 1980). The court adopted a "benefit test" by defining "use" with reference to whether the entrustment " 'served a purpose, object or end for useful or advantageous nature.' " *Id.* (quotation omitted). The court indicated that "use" ceases at the time permission is given to another to use the car and no benefit is conveyed on the entrustor. *Id.* at 522 (quoting *Brown v. Kennedy*, 49 N.E.2d 417, 421 (Ohio Ct. App. 1942)); see also *Samuels v. Am. Auto. Ins. Co.*, 150 F.2d 221, 223 (10th Cir. 1945) ("Where A operates B's automobile, with B's consent and for B's purpose, benefit, or advantage, it may be said that B is using the automobile, but, where A operates B's automobile, with B's consent, solely for A's purposes, and in no sense for any purpose, benefit, or advantage of B, it cannot be said that B is using the automobile."); *Mid-Century Ins. Co. v. Heritage Drug, Ltd.*, 3 P.3d 461 (Colo. App. 1999) (adopting benefit test).

¶ 16. The dissent in *Dutton*, on the other hand, argued that "entrustment" is a form of employing the car, or putting it to "use." See *Dutton*, 383 So. 2d at 523 (Jones, J., dissenting) ("If the act of putting the car into service by entrusting it to another is negligently done and the entrustee negligently drives the

entrusted car into another with resultant injuries, such act of employment (the entrustment) constitutes use of the insured vehicle.").

¶ 17. Other courts' interpretations are not dispositive here, but the multiplicity of views expressed by other jurists reinforces our conclusion that the language on its face is ambiguous. In construing the policy language, we draw on a range of interpretive considerations, including our longstanding practice of construing ambiguous terms in the insurance contract in favor of coverage, legislative policy favoring coverage for individuals injured in accidents, the relationship between homeowner's and automobile liability policies, the relationship of the "while using" restriction to other limitations in the policy, and practical considerations.

¶ 18. An analysis of the policy language in light of these considerations leads us to conclude that the trial court's conclusion that "use" does not include "entrustment," at least when that entrustment does not benefit the entrusting party, reflects an unduly narrow interpretation. See *Coop. Fire*, 157 Vt. at 386, 599 A.2d at 364 (Dooley, J., concurring) (argument that negligent entrustment actions are not covered because they do not arise out of "ownership, maintenance or 'use'" of car involved in accident reflects "'crabbed reading of the policy'") (quoting *Rubins Contractors, Inc. v. Lumbermens Mut. Ins. Co.*, 821 F.2d 671, 675 (D.C. Cir. 1987)).

¶ 19. ■ We have held time and again that, although we "will not deprive the insurer of unambiguous terms placed in the contract for its benefit," *Bradford Oil Co. v. Stonington Ins. Co.*, 2011 VT 108, ¶ 10, 190 Vt. 330, 54 A.3d 983 (quotation omitted), if policy language is ambiguous, "we construe the language in favor of coverage." *Woodward*, 2012 VT 22, ¶ 9; see also *Bradford Oil Co.*, 2011 VT 108, ¶ 10 ("[B]ecause an insurer generally prepares insurance policies with little meaningful input from the insured, this Court construes insurance policy language in favor of the insured . . . ."); *Pharmacists Mut. Ins. Co. v. Myer*, 2010 VT 10, ¶ 10, 187 Vt. 323, 993 A.2d 413 ("We traditionally construe uncertain or ambiguous policy language liberally in favor of the insured and full coverage."); *Am. Fid. Co. v. N. British & Mercantile Ins. Co.*, 124 Vt. 271, 274, 204 A.2d 110, 112-13 (1964) ("Since these liability policies are drafted by the insurer, it is not unreasonable, having in mind that the policies are sold as shields

against liability claims, to construe the terms of the agreement as broad as its intended purpose, and giving its language appropriate breadth of meaning.").

¶ 20. ■ This maxim of construction is consistent with and reinforces important legislative policies. The purpose of Vermont's compulsory automobile liability insurance law, 23 V.S.A. §§ 800-810, is to protect the public and ensure that liability arising from motor vehicle accidents will be covered. See *Smith v. Nationwide Mut. Ins. Co.*, 2003 VT 61, ¶¶ 25-26, 175 Vt. 355, 830 A.2d 108; see also 23 V.S.A. § 800 (requiring owners and operators of motor vehicles to maintain liability insurance policies); *id.* § 941 (detailing uninsured, underinsured, and hit-and-run insurance protections for purpose of providing victim compensation). In arguing that negligent entrustment should be considered to arise from the "ownership, maintenance or use" of an insured automobile involved in an accident, Justice Dooley recognized "the Legislature's broad policy that compensation should be available to victims of motor vehicle accidents from those legally responsible for their injuries at least up to the statutory liability amounts." *Coop. Fire*, 157 Vt. at 386, 599 A.2d at 364 (Dooley, J., concurring). In fact, Justice Dooley noted that the compulsory insurance laws might affect the ability of carriers to exclude certain liabilities. *Id.* ("We have not had an opportunity to consider whether the advent of compulsory insurance in Vermont affects the ability of carriers to include particular exclusions in automobile liability policies. A number of courts have found particular exclusions to be so inconsistent with compulsory insurance laws that they have invalidated them on public policy grounds.").

¶ 21. The significance of our compulsory automobile liability insurance laws is heightened in contexts where the ordinary limitations of homeowner's insurance policies create a likely gap in coverage. In *Cooperative Fire*, this Court considered a negligent entrustment case in which we concluded that the homeowner's insurance carrier was not liable on the basis of an exclusion in that policy, and the automobile liability carrier was likewise not liable on the basis of the limitations in that policy. 157 Vt. at 382-85, 599 A.2d at 362-63. We so held because the applicable exclusions in *both* policies were clear and unambiguous. The majority concluded that a homeowner's policy excluding liability for entrustment of a motor vehicle by an insured did not cover a negligent entrustment claim against the homeowner. In concur-

rence, Justice Dooley argued, "It is fair for homeowner's carriers to leave risks associated with automobiles to automobile insurance and to exclude all coverage in that area."[4] *Id.* at 385, 599 A.2d at 363.

¶ 22. To the extent that risks associated with the entrustment of motor vehicles are commonly excluded from homeowner's policies, this places even more pressure on automobile liability policies to fill the coverage gap in light of the Legislature's goal of ensuring coverage for responsible parties who cause injury in connection with automobiles. As an Alabama Supreme Court Justice recognized in analyzing a similar case:

> Within the broad scheme of insurance coverage afforded by Homeowner liability insurance and Automobile liability insurance, the validity of the "automobile" exclusion for negligent entrustment under the former requires validity of coverage for "use of automobile" under the latter. The public policy of this State, as expressed in the Safety-Responsibility Act, militates strongly against a hiatus of coverage.

*Dutton*, 383 So. 2d at 524 (Jones, J., dissenting).

¶ 23. A holding that excluded negligent entrustment from the scope of the term "use," or that limited the situations in which negligent entrustment may be considered "use" to a subset of entrustment cases, would create a significant risk of a gap in coverage, especially in cases in which the party being sued for negligent entrustment — and, therefore, in need of defense and indemnification — is neither the owner nor the operator of the vehicle involved in an accident. Such a holding would have an impact far beyond the unique circumstances of this case, and could preclude coverage in situations in which the case for coverage may instinctively feel far more compelling than this case given the double-entrustment in the facts, and given the rapidity with which Colby exercised his dominion of the vehicle by entrusting it to decedent.

¶ 24. [6] This broader, bright-line construction of the term "use" is consistent with our traditional approach to construing ambigu-

---

[4] The fact that the law requires liability insurance for all automobiles, but many potential negligent entrustment defendants do not necessarily have liability coverage through homeowner's or renter's insurance policies, further supports allocation of this particular risk to automobile liability versus homeowner's liability insurance.

ous insurance provisions, as well as with important legislative policies, but it does not provide limitless coverage for negligent entrustment claims. The "while using" restriction does not exist in isolation; it is paired with the requirement that the use be "within the scope of [the named insured's] consent." This latter requirement is sufficient to weed out those cases where the liability for which coverage is sought is unconnected to the actions of the insured policyholder. If in this case Macie had given the keys to Colby along with consent to allow decedent to drive her car, the notion that Colby is covered by the insurance associated with that car for an exercise of his dominion over that car that was fully consistent with Macie's permission would not be unreasonable. If, on the other hand, Colby put the car to a use beyond the scope of Macie's mutually understood consent by allowing decedent to drive it, Colby's effort to invoke Macie's insurance policy would seem unfair. The "scope-of-consent" limitation, rather than the "while using" requirement, limits the availability of Macie's liability policy to defend and indemnify a negligent entrustment claim against a bailee of the car. See *Trs. of Net Realty Holding Trust v. AVCO Fin. Servs. of Barre, Inc.*, 147 Vt. 472, 476, 520 A.2d 981, 983 (1986) ("An additional rule of construction exists in Vermont, which, given a choice, prefers that interpretation of a contract which makes it fair and reasonable.").

¶ 25. In so holding, we reject not only the view that entrustment is not "use" across the board, but also the position that "use" is determined with reference to the benefits accruing to the entrustor. In addition to potentially leaving a gap in coverage for the permittee who gratuitously entrusts a vehicle to a third party within the scope of the named insured's permission, the "benefit test" requires subjective judgments about what kinds of benefits to an entrustor do and do not qualify as cognizable benefits for the purposes of the rule. Some cases may be easy — e.g., the entrustor loans a car to another for the purpose of running an errand for the entrustor. See *Nationwide Mut. Ins. Co. v. Dunning*, 252 F.3d 712, 717 (5th Cir. 2001) (recognizing, under Mississippi law, that "injuries arising from the operation of the vehicle by a third party will be covered as long as the third party uses the vehicle to serve some purpose of the permittee"). But where the entrustment is an act of friendship — a step in an ongoing give-and-take of generosities large and small — how do we measure the "benefit" to the entrustor?

¶ 26. Moreover, most courts that have considered whether an entrustment benefitted the initial permittee or the named insured have done so *not* in the context of considering whether the entrustment amounted to "use," but rather in the context of considering whether the second permittee's use was within the scope of consent of the named insured. See, e.g., B. Glenn, *Omnibus Clause of Automobile Liability Policy as Covering Accidents Caused by Third Person Who Is Using Car with Consent of Permittee of Named Insured,* 4 A.L.R.3d 10, §§ 4-7 (1965); see also *id.* § 7(d) ("The omnibus clause usually has been held to protect an original permittee whose authority from the named insured was silent as to his right to allow others to drive or use the automobile where its operation by the second permittee was for the benefit or advantage of the first permittee, although not in his presence, and the use to which it was being put was within the scope of the initial permission."). Many of the considerations underlying the "benefit test" are more properly and more commonly woven into the scope-of-consent analysis.

¶ 27. ■ For all of these reasons, we find that entrustment of another with a vehicle that one owns or controls constitutes "use" for the purpose of the omnibus clause of an automobile liability insurance policy.[5]

## II.

¶ 28. The next question, then, is whether Colby's entrustment of the vehicle to decedent was within the scope of Macie's consent. Relying on a prior Vermont case, Colby argues that he is entitled to a presumption that the use to which he put the vehicle was within the scope of consent absent an express limitation of that consent prior to the actual use, or a use that was "so far afield from the purpose of the loan of the vehicle as to amount to, at best, a temporary tortious conversion." See *Am. Fid. Co.,* 124 Vt. at 275, 204 A.2d at 113.

¶ 29. ■ In this case, although Macie did not specifically state to Colby that he was not to allow decedent to drive the car, there is no dispute that her entrustment of the keys to Colby was

---

[5] In so deciding, and in contemplation of the limitations already outlined above, we do not conclude that mere possession of someone else's car keys, absent other indicia of control, is automatically sufficient to constitute "use" under the subject automobile policy language.

subject to that limitation. Colby himself acknowledged that he understood that Macie did not want decedent to drive her car. Moreover, Colby testified that he told decedent when he first gave him the keys, and later when he saw him at Colby's brother's house, that he should not be driving. Given this undisputed understanding, if Colby gave decedent the keys even though he knew or should have expected that decedent would drive the car, then his entrustment of the car to decedent exceeded the scope of Macie's consent and Colby would not be entitled to coverage under Macie's policy. See, e.g., *Concord Gen. Mut. Ins. Co. v Hills*, 345 F. Supp. 1090, 1093 (D. Me. 1972) ("The law is well established that when the named insured expressly prohibits the use of his automobile by any person other than his permittee, a second permittee using the car solely for his own benefit does not do so with the permission of the named insured.").[6]

¶ 30. If it were undisputed that Colby expected or should have expected that decedent would drive the car after Colby gave decedent the keys, so that Colby's entrustment of the car to decedent went beyond the permission Macie granted Colby, that would end our inquiry. But in his testimony, Colby claims that he gave the keys to decedent for the purpose of allowing decedent to load boxes and listen to the radio in Macie's car, and with the admonition that decedent should not drive. This limited entrustment, Colby argues, did not exceed the scope of Macie's consent (and, presumably, did not constitute negligent entrustment at all, since it did not contemplate decedent's actually driving).

¶ 31. ■ If Colby's testimony accurately describes his understanding when he gave the keys to decedent, *and if that understanding was reasonable*, then his act of giving the keys to decedent for the limited purpose of loading boxes into the car and listening to the car radio might not exceed the scope of Macie's permission.[7] For the purpose of our summary judgment review, we must assume that Colby's testimony on this point is credible. See *Sabia v. Neville*, 165 Vt. 515, 523, 687 A.2d 469, 474 (1996)

---

[6] We need not consider whether decedent's use was for the benefit of Macie or Colby, as Colby makes no such claim, and the evidence would not support it.

[7] A factfinder might ultimately conclude that Macie's permission did not even extend to letting decedent listen to her car radio, but for summary judgment purposes the most we can say is undisputed on this record is that Macie did not give Colby permission to let decedent drive her car.

("In ruling on a motion for summary judgment, it is not appropriate for us to resolve disputed issues of fact or questions of credibility."). However, even accepted as true, Colby's subjective belief as to whether decedent was likely to drive the car is not legally determinative of the question of whether his act of giving the keys to decedent went beyond the scope of Macie's permission. See, e.g., *State Farm Fire & Cas. Co. v. Martin*, 869 P.2d 79, 82 (Wash. Ct. App. 1994) (explaining that "[w]hether a party has permission is based on the objective belief of the insured" and is not determined by the permittee's subjective belief).

¶ 32. ▉▉▉ Accordingly, the question before us is whether a reasonable factfinder could conclude on the record before us that Colby's act of giving decedent the car keys was within the scope of Macie's permission, when Colby believed that decedent would merely load the car and listen to the radio but would not drive the car. To some extent, this inquiry turns on the reasonableness of Colby's asserted belief that decedent would not drive the car. The question of reasonableness is ordinarily for the factfinder. *Morway v. Trombly*, 173 Vt. 266, 275, 789 A.2d 965, 971 (2001) (noting that reasonableness is "ordinarily a question for the jury" unless "we can know with certainty, given the record on appeal, whether a reasonable jury would find [defendant] negligent or not" (quotation omitted)). However, summary judgment is appropriate if no reasonable factfinder could find Colby's belief and, more importantly, his actions reasonable under these circumstances. See *Martin*, 869 P.2d at 82 (affirming summary judgment denying coverage where permittee could not have reasonably believed that she had permission to drive car).

¶ 33. ▉▉▉ We cannot conclude as a matter of law that a reasonable factfinder would necessarily find that Colby's actions exceeded the scope of Macie's permission. A factfinder could conclude that Colby's expectation that decedent would not drive was reasonable given Colby's express admonition that he should not drive, and that Colby's entrustment of the keys to decedent for a more limited purpose — loading the car and listening to the radio — did not run afoul of Macie's restrictions. We will not usurp the role of the factfinder on these points. We leave it to the factfinder to determine whether Colby, in fact, believed that decedent would not drive the car, whether Colby's belief was reasonable, and — the ultimate question — whether his act of

handing decedent the keys went beyond the scope of Macie's permission. See *O'Brien v. Synnott*, 2013 VT 33, ¶ 3, 193 Vt. 546, 72 A.3d 331 (stating that nonmoving party is entitled to "the benefit of all reasonable doubts and inferences" (quotation omitted)).

*Reversed and remanded for further proceedings consistent with this opinion.*