Vermont Superior Court
Filed 03/26/26
Washington Unit

VERMONT SUPERIOR COURT
Washington Unit
65 State Street
Montpelier VT 05602
802-828-2091
www.vermontjudiciary.org



CIVIL DIVISION
Case No. 24-CV-05311

| June Heston v. Norwich University |
| --- |

## ENTRY REGARDING MOTION

Title:          Motion for Summary Judgment  (Motion: 1)
Filer:          Pietro J. Lynn
Filed Date:    May 20, 2025

The motion is GRANTED.


In 2024, Defendant Norwich University sought to fill a vacancy for a vice president (VP) for development and alumni relations (DAR) due to the retirement of the former vice president. Plaintiff Ms. June Heston, who had worked at Norwich earlier in her career, most recently as an associate VP for development (a position supervised by the VP of DAR), applied for the position at the urging of the retiring VP.  Ms. Heston went through the interview process, but a different candidate ultimately was selected for the job.  Ms. Heston claims that certain, apparently ageist, remarks were made by members of the interview committees during the process, and the younger candidate eventually hired was not qualified for the position, at least in relation to her depth of experience and expertise.  Ms. Heston claims that, in not hiring her, Norwich discriminated against her on the basis of age in violation of Vermont's Fair Employment Practices Act (FEPA), 21 V.S.A. §§ 495–496a.  Norwich seeks summary judgment on this last-remaining claim of the complaint.[1]  Ms. Heston argues that the evidence, if not overwhelming, is sufficient that the matter should be determined by a jury.

---

[1] In her complaint, Ms. Heston also claims gender discrimination and retaliation for having reported to Norwich's president a discriminatory statement made during one of her interviews.  Norwich sought summary judgment on all three claims.  In response, Ms. Heston expressly withdrew the gender discrimination claim and did not expressly oppose summary judgment on the retaliation claim.  The court concludes that Ms. Heston does not oppose the entry of summary judgment in Norwich's favor on both gender discrimination and retaliation grounds.  See *Pharmacists Mut. Ins. Co. v. Myer*, 2010 VT 10, ¶ 18, 187 Vt. 323, 325 ("failure to oppose the motion effectively waived the claims").

**I.   *Summary judgment standard***

Summary judgment shall be granted when the moving party shows that there is no genuine issue as to any material fact, "and the movant is entitled to a judgment as a matter of law." V.R.C.P. 56(a). Although the court gives the nonmoving party "the benefit of all reasonable doubts and inferences in determining whether there is a genuine issue of material fact, the nonmovant bears the burden of submitting credible documentary evidence or affidavits sufficient to rebut the evidence of the moving party." *Ziniti v. New England Cent. R.R., Inc.*, 2019 VT 9, ¶ 14, 209 Vt. 433 (quotation omitted). Speculation is insufficient. *Palmer v. Furlan*, 2019 VT 42, ¶ 10, 210 Vt. 375.

The facts in this case are entirely undisputed. Ms. Heston did not attempt to dispute any facts in Norwich's statement of undisputed material facts, Norwich did not attempt to dispute any facts in Ms. Heston's statement of additional material facts, the two statements do not conflict with each other, and for the most part, the asserted facts are supported by specific citations to evidence in the record. The parties do, of course, draw substantially different inferences from those facts.

**II.   *FEPA and the McDonnell Douglas framework***

As it applies to this case, FEPA bars employment discrimination as follows:

It shall be unlawful employment practice . . .:

> (1) For any employer . . . to harass or discriminate against any individual because of race, color, religion, ancestry, national origin, sex, sexual orientation, gender identity, place of birth, crime victim status, or age or against a qualified individual with a disability.

21 V.S.A. § 495(a). The Vermont Supreme Court has been clear that FEPA is patterned after Title VII of the federal Civil Rights Act of 1964, and the "standards and burdens of proof" under FEPA generally are the same as those under Title VII.[2] *Gallipo v. City of Rutland*, 163 Vt. 83, 89 (1994); see also *Carpenter v. Central Vermont Medical Center*, 170 Vt. 565, 566 (1999) (so holding in age discrimination context); *Lavalley v. E.B. & A.C. Whiting Co.*, 166 Vt. 205, 210 (1997) ("[F]ederal decisions represent persuasive authority on the proper interpretation of FEPA. They are not, however, the only sources of persuasive authority.").

---

[2] Any *current* statutory dissimilarities between FEPA and federal analogs does not affect this case as briefed by the parties and analyzed by the court.

As relevant here, in disparate treatment cases (such as this one), the Court has adopted the burden-switching frameworks of both *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) (single motive cases), and *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) (mixed motive cases). See *Lavalley*, 166 Vt. at 211. The parties have briefed this case exclusively as a single-motive case under the *McDonnell Douglas* framework. In short, Ms. Heston claims that Norwich did not hire her because she is "too old." Norwich responds that it hired a different candidate for legitimate, nondiscriminatory reasons only—he was the better candidate—and age had nothing to do with it. Ms. Heston responds that, regardless of what Norwich may say now, age discrimination was the real reason that she did not get the job. Accordingly, the court analyzes this case under the *McDonnell Douglas* framework only.

The Court has described the 3-step *McDonnell Douglas* framework as follows:

This framework [1] requires plaintiff to make an initial showing of circumstantial evidence creating a presumption of illegal discrimination by the defendant. [2] The burden [of production] then shifts to the defendant to "'articulate some legitimate, nondiscriminatory reason'" for the adverse employment action. If the employer meets this burden of production, [3] the final stage of the analysis shifts the burden of production back to plaintiff to prove by a preponderance of the evidence that the legitimate reasons given by the employer are a pretext for discrimination.

*Boulton v. CLD Consulting Engineers, Inc.*, 2003 VT 72, ¶ 15, 175 Vt. 413 (citations omitted).[3] The plaintiff's burden at the prima facie stage is "minimal." *Id*. ¶ 16. To establish a prima facie case, "the plaintiff must demonstrate that: (1) she was a member of a protected group; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the circumstances surrounding this adverse employment action permit an inference of discrimination." *Robertson v. Mylan Laboratories, Inc.*, 2004 VT 15, ¶ 25, 176 Vt. 356. If the plaintiff establishes a prima facie case, and the defendant then comes forward with evidence of a nondiscriminatory reason for the employment action, the plaintiff then has the burden of coming forward with evidence that the reason is mere pretext for the alleged discrimination. However, the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id*. ¶ 27.

---

[3] The burden of persuasion refers to "the notion that if the evidence is evenly balanced, the party that bears the burden of persuasion must lose," while the burden of production refers to "a party's obligation to come forward with evidence to support its claim [or defense]." *Dir., Off. of Workers' Compen. Programs, Dept. of Lab. v. Greenwich Collieries*, 512 U.S. 267, 272 (1994).

3

**III.** *Undisputed facts*

Ms. Heston graduated from Vermont College (then part of Norwich), receiving two associate degrees in 1981 and 1982. She received her bachelor's degree from an unrelated college in 1984. Her first job after college, 1985–1990, was as Norwich's assistant director of admissions and the director of student activities. From 1993 to 1998, she worked as the director of alumni relations at an unrelated college, and from 1998 to 1999 she was the associate director of annual giving at the same college. From 1999 to 2010, she was the president/CEO of 3 charitable organizations. She returned to Norwich in 2015 as associate VP for development (in which she reported to VP Dave Whaley, whose retirement created the vacancy that led to the underlying events). In 2018, she left that position to care for her husband, who later died from cancer. Prior to that, Mr. Whaley and others in the office informally considered her his "heir apparent." Sometime after her husband died, she established her own consulting business. In early 2024, the Norwich administration signaled that it would be conducting a nationwide search (with the assistance of a consultant, Gonser Gerber Search) for candidates to replace Mr. Whaley. Whaley encouraged Heston to apply.

Norwich adopted a multi-interview hiring process for the position. Gonser Geber would assemble a group of candidates. A pre-interview search committee would meet with Gonser Gerber to determine which candidates would move on to a first-round, virtual interview. First-round, virtual interviews would be conducted by a committee, which would determine the candidates moving on to a round of in-person interviews. This second round of interviews included an interview with the DAR leadership team, an interview with a provost/dean team, and a "donor pitch" session with cabinet and other committee members. Then, the candidate would have a final interview with General John Broadmeadow, Norwich's president.

President Broadmeadow did not participate in the process, except at the point when he met with each candidate personally. Ultimately, it was Broadmeadow and Broadmeadow alone who made the hiring decision, and he had complete discretion in this decision. Mr. William McCullough summarized in writing the thoughts of the various first and second round committees and provided that "executive summary" to President Broadmeadow. However, the only role of the various committees was to narrow the initial group of candidates, determine which would be selected to interview in person, and provide general feedback to President Broadmeadow via Mr. McCollough's summaries. Otherwise, no one but President

4

Broadmeadow had authority to make the final hiring decision and—other than Mr. Whaley attempting to put in a good word for Ms. Heston privately to President Broadmeadow—there is no indication that anyone attempted to influence President Broadmeadow, or campaign for or against any candidate, except by participating in the formal process described above. Nor is there any evidence that President Broadmeadow sought such counsel from anyone.[4]

Ms. Heston was among a group of 15 initial candidates considered by the search committee on June 6, 2024. The search committee consisted of Kristin Dodge, Ed Hockenbury, Mark Madsen, David Pierce, Kim Reilly, Pam Spencer, Aron Temkin, and Dave Whaley. The search committee selected Ms. Heston and 5 others to proceed to first-round, virtual interviews. Ms. Heston's first-round, virtual interview was conducted on June 11, 2024. Committee members consisted of MaryAnne Burke, Kristin Dodge, Ed Hockenbury, Mark Madsen, Bill McCollough, David Pierce, Kim Reilly, and Aron Temkin. The first-round, virtual committee selected Ms. Heston and 3 others to proceed to in-person interviews.

As for second-round, in-person interviews conducted on July 8 (for Ms. Heston): the DAR leadership committee consisted of David Casey, Reed Curry, Laurie LaMothe, and Diane Scolaro; the provost/dean committee consisted of Karen Gaines and Lea Williams; and the donor-pitch committee included Jamie Comolli, Kristin Dodge, Ed Hockenbury, Bill McCollough, David Pierce, Danielle Pelczarski, Kim Reilly, Sarah Stefaniuk, Aron Temkin, and Bizhan Yahyazadeh.

Proffered evidence of ageism includes the following. At the June 6, 2024, search committee meeting, which was a pre-interview consideration of the entire group of candidates, when the conversation turned to Ms. Heston, committee member Mark Madsen said, "I just have one concern, and that is, and I know this is politically incorrect but she is roughly my age, or she is my age, and I know her very well, and I think she is a wonderful person and probably would fill in really well and do a great job, but is she on board for five years? . . . We're gonna have a

---

[4] In his deposition, Mr. Whaley describes briefly discussing the candidates with President Broadmeadow. His testimony is exceptionally vague, there is no particular evidence that President Broadmeadow was seeking his counsel or intending to rely on it, and Mr. Whaley had no role in the hiring process except to the extent that he participated in the search committee's meeting screening the initial group of 15 candidates.

new president, as Aron points out, and I don't want to go through this again in 3 to 5 years."[5] Gonser Gerber representative Pam Spencer immediately responded:

> So the impression I got from June, I did talk to her about . . . that Norwich is going through the strategic planning process, and that the intention is to go into a campaign, so she was aware of that. The impression I got is she does intend to stay around the entire time. It is possible, though, that at the end of the campaign she may decide to leave and at that point you would have to go through this process again, but the one thing that I feel that June brings with her is the connectedness not only to the institution but to the greater community as well . . . . It is possible, since I don't live there I will have to rely on you correct me if I'm wrong, but she does carry some clout . . . she has some connections in the community that I think she would be able to leverage for the campaign. Now, that doesn't mean you make her vice president, but it would mean have her involved in the campaign. . . .

Mr. Madsen responded, "Then I'm all for saying yes to June." With that the committee voted unanimously in favor of approving Ms. Heston to move forward in the process.

Mr. Madsen also was on the committee that conducted the first-round, virtual interview with Ms. Heston on June 11. Near the beginning of the interview, in response to a question about career goals, Ms. Heston's response included this, "I'm sort of at the end of my career." And the "reason for going back to Norwich would be to sort of finish my career on a really high note." At the end of the interview, after Ms. Heston signed off, the committee began discussing her candidacy. It was a comprehensive and candid conversation. During it, Mr. Madson said, in relevant part: "The other concern I have too is she mentioned right off the bat she's at the end of her career. Are we looking at this position for only 2 or 3 years or is this a 5 or longer kind of thing?" Another member then pointed out that the "recruiter" said that she had been asked about it and that she said she would commit to at least 5 years. Mr. Madsen appeared to accept that and said, "OK." He did not come back to the matter. Another member pointed out that the consultant had advised them that many people stay in these positions only about 18 months (the implication being that any concern over how long a successful candidate might stay was largely out of their control). Later in the conversation, Mr. McCollough explained, regarding Ms. Heston's "end of my career" comment, that such a circumstance in many ways is a positive one (i.e., such a candidate is not distracted by extrinsic career goals beyond the current position).

---

[5] The June 6 committee meeting and June 11 virtual interview are in the record as digital recordings. What appears here is based on the court's own observation of those recordings and transcription of relevant portions. No written transcript is in the record.

That was the end of the matter. At some point after all the interviews were concluded, the committee decided that Ms. Heston and 3 other candidates would proceed to in-person interviews.

At the beginning of the DAR leadership team in-person interview on July 8, committee member Dave Casey made a statement to Ms. Heston. As she later recalled in her deposition: "We were starting the meeting and the first thing Dave said was, this is the first thing said in the meeting, June, as you know, I am the Interim VP and I'm not interested in the job because, frankly, I think I'm too old; so why do you want the job? We are going to want someone here for the next seven to ten years."[6] Heston Depo. at 101. The team had a pre-selected, uniform list of questions that were to be asked of each candidate, and this was not one of them. As Ms. Heston tells it, when this happened, before she had a chance to respond, another committee member jumped in and said, "Dave, you're, you're getting off script, we need to stick to the script." *Id*. at 102. The committee stuck to the script after that. There was no further mention of anticipated longevity in the job or anything age-related in any way.

When Ms. Heston met with President Broadmeadow later that day, she told him about Mr. Casey's statement at the start of their conversation.[7] Her version of events is as follows:

A. It, it—well I, I initially told him what happened; that was the first thing I did, I told him about the, the comment that Dave Casey made.

Q. What did, what specifically did you tell him?

A. I told him exactly what I just said to you.

Q. Meaning what you said earlier in your testimony?

A. Yes.

Q. What was the President's response?

A. He apologized.

Q. What did he say?

A. He said I'm very sorry that happened.

---

[6] This interview was not electronically recorded. Mr. Casey recalls the circumstances somewhat differently. However, for summary judgment purposes, Norwich accepts Ms. Heston's version of the events.

[7] Mr. Broadmeadow testified that someone else, likely Mr. McCollough, also mentioned the incident to him at some point, though Ms. Heston was the first to mention it.

Q. Did he assure you that he was the one who was going to make the decision?

A. He did not.

Q. Did you understand he was the one who was going to make the decision?

A. I, I didn't make any assumption at that point.

Q. Did, did he say anything that suggested to you that he would hold it against you that you raised this concern about Dave Casey?

A. No. I—he said—I said, after I told him that and he said I'm very sorry, I said I'm letting you know because that can't happen, that is illegal. And he just apologized again; but he seemed bristled a bit. I assumed that was at Dave.[8]

Heston Depo. at 116–17. There is no indication that the matter came up again in Ms. Heston's interview with President Broadmeadow or that it derailed it in any way.

At some point thereafter, President Broadmeadow spoke to Mr. Casey about the matter. As President Broadmeadow recalls:

Q. Did you have any follow-up discussions with Dave Casey about the comments that June reported to you?

A. I had a conversation with Dave that "Hey Dave, I heard you said this while you were having a conversation with June. You probably shouldn't have said that in the middle of an interview. You know, you should have kept, you know, your relationship with June separate and stuck to the script as you were advised in there. You know, you shouldn't have had those kind of conversations when you were doing a formal interview."

Q. Why did you think it was important to have that follow-up discussion with Dave?

A. Because June had said something to me about it, and it was confirmed with the other comments—the other comment that I got afterwards. And I just felt it was important for me to tell Dave, next time, keep it—keep focused on topic.

_____

[8] As described, in real time, Ms. Heston thought that Mr. Broadmeadow was "bristled a bit" at Mr. Casey. She also testified that she later came to wonder if he instead was "bristled" at her.

8

. . .

Q. Do you recall whether Mr. Casey relayed his version of events to you when you spoke with him about this comment?

A. No. Dave was very—"Yes. That's what I will do from now on." He didn't try to defend himself or anything else.

Broadmeadow Depo. 49–50. Mr. Casey's version of the same conversation is as follows:

Q. So during that week of interviews, did you hear about that comment again from anyone?

A. I heard about it from the president.

Q. Tell me about that.

A. I was summoned to his office, and I was counseled. He said "Did you say this to June?" I said "Yes, I did. Here's the context." And he said "You realize that's not cool. And consider yourself counseled."

Casey Depo. 34–35.

At the time that President Broadmeadow met with Ms. Heston, he would have been provided Mr. McCollough's written summary of the June 11 first round, virtual interviews but not the complete summary including the second round, in-person interviews. The June 11 summary is not drafted to make any sort of recommendation. It instead includes some candidate background and a brief list of perceived or potential pros and cons or issues to consider. Ms. Heston objects that hers includes the following statements: (a) "At the end of her career. Could be plus or minus."; (b) "Will she connect with 90s grads?"; and (c) "Not the best candidate in any one area. Can she scale up fundraising and connect with younger alums?"

It is unclear when Mr. McCollough provided the complete executive summary of the candidates, including notes from both the virtual and in-person interviews, to President Broadmeadow. The final report repeats the statements that Ms. Heston finds objectionable from the earlier draft of the virtual interview notes. Otherwise, the final report also includes this: "Risk: Not the best candidate in any one area. Can she scale up fundraising and connect with younger alums? Can she hold the DAR team together?"

As it relates to Ms. Heston, it is not clear that the timing of when President Broadmeadow received that complete executive summary has any relevance. Mr. McCollough's testimony is that he would not have been able to deliver the final executive summary until some time after the

9

last candidate's in-person day of interviews.  That day was July 12.  President Broadmeadow's testimony is that his mind was firm at the conclusion of the last of his 4 interviews that the choice was down to 2 candidates, and Ms. Heston was not among them:

> Q.  Had you made your decision [about who to hire] by the time you got these documents with the feedback from these three teams [the final, complete executive summaries covering both virtual and in-person interviews]?
>
> A.     The final decision, no.  I did not make that.  I had these, you know, by the time I made the final decision, but by the time they left the interview with me I had a pretty clear mind of a clear division in candidates.
>
> Q.     Tell me what your clear division was when you left that final of the four interviews?
>
> A.     After my four interviews, I knew that [Candidate A] and June were the bottom two candidates, and it came down to Brian Doyle and [Candidate B] as my final two.
>
> Q.     Why were [Candidate A] and June Heston your bottom two?
>
> A.     [Candidate A] because he really didn't have a good sense of what the job requirements were.  And was a little bit too overly aggressive in areas outside— what he thought he would be doing outside of his responsibilities.  It was too expansive.  I don't think he had a good sense of what the job responsibilities were.  For June the bottom line of her interview was it was completely flat.  It was "I have been here.  I've done it before.  I'm going to come in and I'm just going to be a good candidate for you."  It represented nothing to me in her interview. There was nothing that described any type of new approach or even desire to do a new approach.  I juxtaposed that with the other two candidates.

Broadmeadow Depo. 56–57.  Thus, unless one doubts his testimony, President Broadmeadow determined not to hire Ms. Heston before he received the final executive summary from Mr. McCollough.

Candidate B eventually withdrew from consideration, and Mr. Broadmeadow subsequently made the formal decision to hire Mr. Doyle.  It is unnecessary to detail here Mr. Doyle's professional background and relative merits as a candidate.

**IV.    *Analysis***

Ms. Heston argues that she was not hired due to age discrimination. She sees that discrimination in the arguably age-related statements made by: (a) Mr. Madsen at the June 6 screening committee meeting and June 11 virtual interview, (b) Mr. Casey at the July 12 DAR team interview, and (c) Mr. McCollough in his written executive summaries of the various committees' input on the candidates. She argues at length that, among the candidates, she was the most qualified, and Mr. Doyle, the younger candidate who got the job, was not just less qualified by comparison but he was altogether "unqualified." She also argues certain deposition testimony by President Broadmeadow, Mr. Casey, and Mr. McCollough may reveal to a jury that they lack credibility or are trying to cover up their discriminatory conduct. Norwich argues that Ms. Heston has failed both to make out a prima facie case of discrimination and to demonstrate a triable issue as to whether President Broadmeadow's nondiscriminatory determination that Mr. Doyle was the better candidate was a mere pretext to discriminate against Ms. Heston.

A.      *Ms. Heston's prima facie case*

To establish a prima facie case, "the plaintiff must demonstrate that: (1) she was a member of a protected group; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the circumstances surrounding this adverse employment action permit an inference of discrimination." *Robertson v. Mylan Laboratories, Inc.*, 2004 VT 15, ¶ 25, 176 Vt. 356. Norwich does not dispute the first 3 elements of Ms. Norwich's prima facie case. It concedes that she was a member of a protected group based on age, and the record is clear that most everyone involved in the selection process was aware of her age and the approximately 10-year difference between her and Mr. Doyle, the successful candidate. Insofar as she made it to the final four, it concedes that she was qualified for the position. She suffered an adverse employment action insofar as she did not get the job. Norwich argues, however, that the circumstances do not permit an inference of discrimination.

However close a call, the court disagrees for two principal reasons. First, Norwich's argument is predicated exclusively on the statement made by Mr. Casey at the July 12 DAR team meeting, which it suggests may be dismissed as a "stray comment" by a non-decisionmaker. As set forth above, the relevant evidence is much broader than that. More importantly, as the Court has explained, "Plaintiff's burden of proof in the prima facie case is minimal. We have called the burden 'a relatively light one.' The Court of Appeals for the Second Circuit has repeatedly called it 'de minimis.'" *Carpenter v. Central Vermont Medical Center*, 170 Vt. 565, 566 (1999)

11

(citation omitted). Scrutinizing the plaintiff's prima facie showing too heavily risks merging the first and third steps of the *McDonnell Douglas* framework. "Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee. If the trier of fact believes the plaintiff's evidence, *and if the employer is silent in the face of the presumption*, the court must enter judgment for the plaintiff because no issue of fact remains in the case." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981) (emphasis added).

In this case, it is clear that Ms. Heston was in a protected group, she was qualified, and she did not get the position while a younger candidate did. It is further clear that some arguably age-related statements or questions relating to Ms. Heston were made during the hiring process by Norwich personnel involved in that process and, at least to some extent, were conveyed to President Broadmeadow. In the court's view, however minimal a showing this may be, it is sufficient to trigger Norwich's burden to come forward with its nondiscriminatory reason for not hiring Ms. Heston.

B.      *Norwich's burden of production*

Norwich easily satisfies its burden of coming forward evidence of a nondiscriminatory reason for not hiring Ms. Heston: that its ultimate decisionmaker, President Broadmeadow, viewed a different candidate as having better qualities for what he was looking for, all unrelated in any way to age. Ms. Heston does not argue that Norwich has somehow failed to satisfy its burden of production under *McDonnell Douglas*.

C.      *Pretext*

The heart of the matter for this case lies in the third step of the *McDonnell Douglas* framework: whether Ms. Heston has established that there is at least a triable issue as to pretext, i.e., whether Norwich's *real* motivation in hiring Mr. Doyle was to avoid hiring Ms. Heston because she was perceived to be "too old." Notwithstanding some arguably ageist statements made in the hiring process, the Court concludes that a fact finder could not find in Ms. Heston's favor without resorting to impermissible speculation. Norwich is entitled to summary judgment for that reason.

The record is clear that there was one ultimate decisionmaker as to who would be hired: President Broadmeadow. The only function of the June 6 screening committee was a preliminary gatekeeping role to determine who would sit for a virtual interview. The committee

voted unanimously in favor of Ms. Heston at that meeting, and there is no indication that President Broadmeadow ever had any awareness at any relevant time of Mr. Madsen's objectionable, oral statement at that meeting. There were seven other members of that committee who never exhibited any skepticism based on age whatsoever. Moreover, to the extent that his concern was about Ms. Heston's intended longevity in the position, that question was quickly answered in her favor.

Mr. Madsen again expressed that concern (over anticipated longevity, not age) at Ms. Heston's June 11 virtual interview. Again, there is no indication that President Broadmeadow ever had any awareness at any relevant time of Mr. Madsen's arguably objectionable, oral statement at the June 11 interview. Mr. Madsen was clear that Ms. Heston prompted the concern herself by saying, near the beginning of her interview, that she was at the end of her career (not that she might be "too old"). Again, there were seven other members of that committee who never exhibited any skepticism based on age whatsoever. Moreover, to the extent that Mr. Madsen's concern was about Ms. Heston's intended longevity in the position, that question again was quickly answered in her favor.

As for Mr. Casey's statement at the July 12 DAR team interview, Ms. Heston affirmatively raised that issue with President Broadmeadow at the beginning of their meeting, the same day as the DAR team interview. President Broadmeadow's response was to repeatedly apologize to Ms. Heston that it had happened. Then he met with Mr. Casey to "counsel" him that he should not have done that and that, in Mr. Casey's words, it was not "cool." There is no dispute that this is what happened, and there is no evidentiary basis for any reasonable inference that in doing so President Broadmeadow was being disingenuous.

There is some evidence in the record that Mr. Whaley at some point put in a good word with President Broadmeadow in support of Ms. Heston's candidacy. Otherwise, there is no evidence in the record that Mr. Madsen, Mr. Casey, or anyone else ever attempted to persuade President Broadmeadow about the ultimate decision of who he should hire.[9] More specifically,

---

[9] There is in discrimination cases a theory of liability known as "cat's paw" liability. "The cat's paw theory is a way of proving discrimination when the decisionmaker herself is admittedly unbiased. Under the theory, the discriminatory animus of a non-decisionmaker is imputed to the decisionmaker where the former has singular influence over the latter and uses that influence to cause the adverse employment action." 1 Employment Discrimination Law and Litigation § 2:25 (footnotes omitted). Ms. Heston has not advanced any such theory of liability in this case, and the record before the Court does not suggest that any non-decisionmaker in this process held such sway.

there is no evidence that Mr. Madsen, Mr. Casey, or anyone else ever attempted to campaign against Ms. Heston on any basis or in favor of any other candidate. The evidence uniformly shows that Norwich had a clear hiring process, the various committee members had no responsibility for the ultimate hiring decision, and that everyone followed the prescribed process.

There is scant to no evidence that Mr. Madsen's or Mr. Casey's oral statements had much any impact on anyone, much less President Broadmeadow, except insofar as they may have influenced how Mr. McCullough drafted his executive summary documents.

The focus thus turns to the arguably age-related statements in Mr. McCollough's executive summaries, and Ms. Heston's comparative argument that she was best qualified for the position whereas Mr. Doyle, her younger comparator, was unqualified. The latter argument presumably is that she was so obviously a good choice for the job and, by comparison, Mr. Doyle was so obviously a bad choice, that the jury could infer that Norwich decided to hire the younger candidate even though it knew he was not fit for the job to avoid hiring her due to her age. The court addresses this latter argument first.

When considering discrimination cases, courts do "not substitute their business judgment for that of the employer." *Carpenter v. Central Vermont Medical Center*, 170 Vt. 565, 567 (1999); accord *Robertson v. Mylan Laboratories, Inc.*, 2004 VT 15, ¶ 35, 176 Vt. 356 (2004) ("This Court 'may not second-guess an employer's non-discriminatory business decisions, regardless of their wisdom.'" (citation omitted)); see also *Gogel v. Kia Motors Mfg. of Georgia, Inc.*, 967 F.3d 1121, 1143 (11th Cir. 2020) ("Title VII does not empower a court (or jury) to 'sit as a super-personnel department that reexamines an entity's business decisions.'" (citation omitted)). "The question is not whether [the employer] made a good decision, or even a fair one. *The question is whether it took an adverse employment action based on a discriminatory animus.*" *Schaffhauser v. United Parcel Serv., Inc.*, 794 F.3d 899, 903 (8th Cir. 2015) (emphasis added).

Naturally, then, when the underlying business decision is to hire (or promote, etc.) one candidate versus another, the court (or, by extension, a jury) cannot simply weigh the relative merits of the candidates on its own to determine if it would have made a different decision, as though disagreement alone necessarily would reveal impermissible discrimination on the employer's part. Rather, although the issue is contextual, may be nuanced, and depends in part on the other evidence of discrimination in the case, courts generally will require some significant

14

disparity between candidates before permitting the layperson finder of fact to infer that the employer's selection, based on relative merit, is evidence of discrimination. See *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457–58 (2006) (per curiam) (describing certain applicable standards prevailing in various courts but not adopting any one in particular). The 7th Circuit Court of Appeals, after discussing numerous authorities, concluded as follows:

> Accordingly, we now hold that where an employer's proffered non-discriminatory reason for its employment decision is that it selected the most qualified candidate, evidence of the applicants' competing qualifications does not constitute evidence of pretext "unless those differences are so favorable to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue." In other words, "[i]n effect, the plaintiff's credentials would have to be so superior to the credentials of the person selected for the job that 'no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.'"

*Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1180–81 (7th Cir. 2002) (citations omitted); see also, e.g., *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001) (adopting the same standard); *Rathbun v. Autozone, Inc.*, 361 F.3d 62, 75 (1st Cir. 2004) ("We recognize that there may be situations in which the difference in qualifications is so stark as to support an inference of pretext."). Whatever may be the precise way to state the standard, the sentiment is salient in this case.

Ms. Heston argues that Mr. Doyle was not qualified for the job. She points to no objectively stated application standard that he did not satisfy, however. Rather, her argument essentially is that, *in her subjective view*, she was a much better candidate in relation to him. Her assessment depends on her comparison of her professional background to his, and all that in relation to what *she thinks* would have best served Norwich's interests. It largely ignores how the two candidates performed in their myriad interviews and when they met with President Broadmeadow, and Norwich's own views about what was in its best interests, much less its subjective assessments of the candidates' competing qualities. Norwich addresses this line of argument by marshalling the evidence in support of its conclusion that, between them, Mr. Doyle was the better candidate.

In the circumstances of this case, the court sees no point in going down this road. The record is unassailably clear that, as between Mr. Doyle and Ms. Heston, Norwich had a good

15

problem: two very accomplished, high-quality, promising candidates. Each was selected to participate in the process by Gonser Gerber, each made it past the June 6 screening committee, each made it past the subsequent virtual interview, and each participated in a full day of in-person interviews before meeting with President Broadmeadow, the ultimate decisionmaker. The various interview committees' observations were summarized and include various positive and less positive assessments of each—each brought different strengths and weaknesses to the table. President Broadmeadow exercised his judgment and made the decision. On balance, this is simply not a case in which the selection of one candidate over the other, based on an objective comparison of the two candidates, reasonably provides evidence of discriminatory animus against the one who did not get the job, either on its own or in the context of all the circumstances of the case. See *Rathbun*, 361 F.3d at 75 (noting that the difference in qualifications must be stark).

This leaves as proffered evidence of discrimination Mr. McCollough's executive summary of the June 11 virtual interview committee's thoughts, there being no evidence contradicting President Broadmeadow's testimony that his decision excluding Ms. Heston from further consideration was made before he received the more complete summary including the thoughts of the in-person committees.[10] The allegedly objectionable statements in the former summary were: (a) "At the end of her career. Could be plus or minus."; (b) "Will she connect with 90s grads?"; and (c) "Not the best candidate in any one area. Can she scale up fundraising and connect with younger alums?"

As it appears in the report, characterizing statement (a) as discriminatory on the basis of age requires at least two inferential leaps. First, being at the end of one's anticipated career can be—but is not necessarily—related to age. To conclude that this statement had an improper effect, the jury would have to infer that the "end of career comment" was meant to highlight Ms. Heston's age and status. Second, the jury would then have to infer that this connection was intended as a negative association and that "end of career" effectively meant "too old to hire, regardless of her qualifications." In this respect, the Court is guided by the Vermont Supreme Court's analysis in *Lamay v. State*, 2012 VT 49, ¶ 10, 193 Vt. 635 (mem.). While that case was

---

[10] As far as potentially objectionable statements go, the final executive summary adds little to the initial draft and would not change the analysis here even if one were to assume that President Broadmeadow had access to it before selecting against Ms. Heston.

a mixed motives case, the Vermont Supreme Court analyzed the impact of comments that had negative connotations to a protected class that were made in the workplace on a negative employment event. The Vermont Supreme Court noted that certain stray remarks, even if they correlate to a particular stereotype, "do not inevitably prove that age discrimination played a part in a particular employment decision." *Id*. (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989)). It may suggest a "stereotyped attitude or a hostile environment but not necessarily an illegitimate motive . . . ." *Id*. The jury needs something more to connect the remark to the decision. Thus, in the immediate case, the jury would need to not only find that "end of career" was an agism reference but that it was intended to influence or affect the decision-making process in a negative manner.

Such double inferences are simply not reasonable based on the circumstances in which this statement was made. Even to the extent that a jury might infer that McCullough's "end of career" comment was connected to Ms. Heston's age status, the statement is also a direct quote from Ms. Heston, who told the committee as part of her interview that she was at the end of her career. In that respect, McCullough's report repeats a statement that Ms. Heston made and introduced to the process. As well, the report's plain language and further qualification to the phrase: "Could be plus or minus," does not advocate that it was a detriment in the eyes of the committee. For these reasons, the Court concludes that this statement does not constitute sufficient evidence of discrimination or an intent to influence the decision-making process against Ms. Heston on the basis of her age.

Statements (b) and (c) apparently relate to a belief among some in the development community that graduates of a certain age are around probable peak earnings capacity and are important targets of development efforts. There is evidence that some members of committees believed that targeting '90s graduates was important in that regard. Ms. Heston was an '80s graduate. Mr. Doyle was a '90s graduate. It is not clear whether the question about "90s grads" is about age so much as class—the same question might obtain if the candidate were from a class after the 90s. There is also evidence that Mr. Doyle had extensive contact with his peer classes as a class officer. However, the question about "younger alums" may reasonably imply, at least to some extent, that there is some age-related distinction implied here. A finder of fact could reasonably conclude that this statement is questioning whether Ms. Heston, due to her age, would be able to "connect" with Norwich's alums who are younger than she is.

Like the first statement, however, these comments alone do not support the necessary evidence that they were (1) intended to highlight Ms. Heston's age or (2) imply a negative connotation. *Lamay*, 2012 VT 49, at ¶ 10. Again, as with the first statement, even if the Court were to accept the inference that these statements were intended to highlight Ms. Heston's age, the context shows that they are only posed as vague food-for-thought observations and not recommendations or advocacy for the ultimate decisionmaker, President Broadmeadow. None is framed in favor of any particular conclusion and neither the statements nor the report as a whole, nor the committee process expressly or implicitly encourages President Broadmeadow to adopt a particular candidate.

Perhaps most importantly, there is no evidence in the record to support any determination that these statements had an impact on President Broadmeadow whatsoever. He acknowledged in his deposition that some in the development community at the time thought that there should be some concerted focus on '90s grads. He declined to agree with the sentiment. His position, asserted by him, and uncontradicted by any other evidence, was that the successful candidate needed to bring something new to the office (in his view it needed to change course going forward), and needed to focus on development with graduates of all ages and, as importantly, with potential donors outside the universe of graduates (corporate gifts, etc.).

In short, considering the totality of the circumstances, the finder of fact would need to engage in pure speculation to find that President Broadmeadow's hiring decision was secretly motivated by some discriminatory animus against Ms. Heston. It would also require speculation to find that the process leading up to his decision was so infected by discriminatory animus against her that the well had somehow become poisoned, and that so affected President Broadmeadow's decision-making that the matter ought to be resolved by a jury. Ms. Heston has the ultimate burden of persuasion in this case, and it cannot be satisfied with speculation. See *Palmer v. Furlan*, 2019 VT 42, ¶ 10, 210 Vt. 375.

Perhaps recognizing these weaknesses, Ms. Heston argues that the circumstances are such that the jury might reasonably determine that deposition testimony from Mr. McCollough, Mr. Casey, and President Broadmeadow lacks credibility and demonstrates that they now are attempting to "rewrite history," which presumably means attempting a coverup in retrospect of the discrimination really at work during the underlying events. The court does not make credibility determinations on summary judgment. "On the other hand, the fact that a party

18

desires to have an affiant's statements tested by a jury, in and of itself, will not preclude a grant of the motion unless the evidence presented casts sufficient doubt on the affiant's credibility to create a genuine dispute of material fact." 10B Wright & Miller, Fed. Prac. & Proc. Civ. § 2730 (4th ed.) (footnote omitted).

As for Mr. McCollough, Ms. Heston points to questions put to him in his deposition as to why he put certain statements in his executive summaries and what they meant or implied. Whatever a jury might think of such a line of inquiry, it does not change the words on the page that were given to President Broadmeadow, the fact that the ultimate decision was his alone to make, and that no one (including Mr. McCollough), regardless of private motivations, took any palpable step to influence him.

The same is true of Mr. Casey, who at deposition recalled his objectionable statement at the DAR meeting differently than everyone else on record described it. Again, whatever a jury might think of Mr. Casey's more generous recollection of his own conduct, that does not change the information that filtered through to President Broadmeadow, the fact that the ultimate decision was his alone to make, and that no one, regardless of private motivations, took any palpable step to influence him.

Finally, Ms. Heston argues that President Broadmeadow's own testimony was both contradictory and dismissive, which might reflect on his credibility. She points out, for example, that he testified both that her interview went "very well" but also that it was "flat" and that contributed to his decision. In context, President Broadmeadow's statement that the interview went "very well" was in response to inquiries as to whether Ms. Heston seemed "rattled" after reporting Mr. Casey's statement to him. He said that she did not seem rattled, and the rest of the interview went very well. Later, when being questioned as to his hiring decision, he said, for example:

> For June the bottom line of her interview was it was completely flat. It was "I have been here. I've done it before. I'm going to come in and I'm just going to be a good candidate for you." It represented nothing to me in her interview. There was nothing that described any type of new approach or even desire to do a new approach. I juxtaposed that with the other two candidates.

Broadmeadow Depo. 57. The statements that Ms. Heston finds contradictory in fact are addressing completely different subject matters, whether she was rattled by Mr. Casey or when

19

reporting his statement to President Broadmeadow, and why President Broadmeadow decided not to hire her. There is no inconsistency, much less one that points up any discriminatory animus.

Ms. Heston also argues: "President Broadmeadow's testimony that Ms. Heston was out of the running after the four interviews were concluded contradicts what he told Dave Whaley later in the process. According to Mr. Whaley, President Broadmeadow told him that after another qualified candidate [Candidate B] dropped out, he had narrowed the potential candidates to either Brian Doyle or June Heston and was trying to decide between them." Ms. Heston's Opposition to Summary Judgment at 10 (filed Jan. 15, 2026). Ms. Heston cites pages 18–20 of Mr. Whaley's deposition for such testimony. In fact, Mr. Whaley makes no such representation there or elsewhere. Rather, the exchange is alleged to have occurred after Candidate B had withdrawn, when—as President Broadmeadow tells it—Mr. Doyle was the last of the final two candidates between whom he was deciding. Mr. Whaley inferred or assumed that Ms. Heston was still a consideration at that time. However, in his deposition testimony, he nowhere attributes any statement to that effect to President Broadmeadow. There is no evidence that President Broadmeadow said such a thing. In that regard, Mr. Whaley's testimony is not inconsistent with President Broadmeadow's and does not lay the foundation for the impeachment that Ms. Heston would seek to put before the jury.

Finally, Ms. Heston argues that President Broadmeadow has demonstrated that he does not appreciate the wrongfulness of Mr. Casey's conduct. She argues:

> Next, there is the fact that President Broadmeadow does not believe that Mr. Casey's direct comment on Ms. Heston's age was problematic. In his own words, he did not involve HR or write anything down in his so-called counseling of Mr. Casey because "this was not something that, you know, we felt was in any way inappropriate." This suggests that President Broadmeadow does not appreciate the wrongfulness of taking into account someone's age in a hiring decision. Thus, a reasonable jury could conclude that because President Broadmeadow does not know where the line is, his protestations that he did not cross it with Ms. Heston ring hollow.

Ms. Heston's Opposition to Summary Judgment at 13 (filed Jan. 15, 2026). This line of argument exaggerates the record. It is true that, during his deposition, President Broadmeadow declined to speculate about Mr. Casey's private motivations at the DAR team meeting, both because—as he asserted—he was not there, and because he knew that Mr. Casey and Ms. Heston

had known each other for many years and he believed that Mr. Casey's statement was informal and probably arose the way it did due to their relationship. President Broadmeadow also pointed out that Mr. Casey described himself as too old; he did not describe Ms. Heston that way. It is also true that he explained that he did not think the matter required formal discipline, and none was taken. However, it is also entirely unrebutted that when Ms. Heston broached the topic at her interview with him, he repeatedly apologized, and thereafter "counseled" Mr. Casey. The record would not support any finding that President Broadmeadow was somehow so completely oblivious to the potential impropriety and unlawfulness of genuine age discrimination that all his otherwise uncontradicted testimony about his nondiscriminatory decision-making should be swept aside, inviting the jury to engage in speculation.

## V. *Conclusion*

In summary, Ms. Heston objects to a small handful of isolated statements made by Mr. Madsen, Mr. Casey, and Mr. McCollough. There is no evidence that any oral statements made by Mr. Madsen or Mr. Casey had any impact on the committees in which they were involved, both of which included numerous other members and advanced Ms. Heston in the hiring process. Nor is there any evidence that their oral statements had any impact on any of the many other Norwich officials involved in the hiring process. There also is no evidence that Mr. McCollough's arguably objectionable written statements had any impact on President Broadmeadow. In the totality of the circumstances, the Court concludes that a jury would have to engage in impermissible speculation to conclude that the unfavorable hiring decision was motivated by age discrimination in violation of FEPA. Norwich therefore is entitled to summary judgment.

### ORDER

For the foregoing reasons, Norwich's motion for summary judgment is **Granted**. The present matter is dismissed, and the Court Clerk will remove it from the jury draw schedule for spring of 2026. The pre-trial conference in this matter scheduled for March 26, 2026 is Cancelled.

Electronically signed on 3/25/2026 4:54 PM pursuant to V.R.E.F. 9(d)

Daniel P. Richardson
Superior Court Judge